# EXHIBIT 2

Exh. 2

# ANSALDO SIGNAL

A Finmeccanica Company

**UNION SWITCH & SIGNAL** Ⓢ

**August 3, 2004**
**USS/SACHS-002**

**RECEIVED** AUG 0 4 2004

Sachs Electric
7941 Woodruff Court
Springfield, VA  22151

Attention:    Charley Wooldridge

Subject:    **Subcontract for Contract FM8204**
**Purchase Order No. T03H01J2**
**ATP Track Circuit Replacement**

Dear Mr. Wooldridge:

Enclosed please find two (2) copies of the executed subcontract for your records.   Please be
advised that this contract has been assigned purchase order number T03H01J2.  Sach's is
requested to include this number on all correspondence including invoices.

Please call me if you have any questions or concerns.

Sincerely

**Union Switch & Signal**

Paula Jean Pawlak
Project Manager

Enclosures

CC:    File

## INSTALLATION SUBCONTRACT for WMATA ATP REPLACEMENT

THIS INSTALLATION SUBCONTRACT (this "Agreement") is made this ___28 ᵗʰ___ day of May 2004 (the "Effective Date"), by and between UNION SWITCH & SIGNAL INC., a Delaware (USA) corporation having a place of business at 1000 Technology Drive, Pittsburgh, PA 15219 ("Contractor"), and Sachs Electric, a corporation having a place of business at 1572 Larkins Williams Road, Fenton, MO 63206("Subcontractor").

### WITNESSETH:

The parties hereto, intending to be legally bound hereby, agree as follows:

1.  Definitions

    1.1    "Subcontract Documents" means and includes the following, each of which is incorporated herein by reference:

    1.1.1    This Agreement, including Exhibit I, The "Work", and Exhibit II, "Progress Payment Schedule," are attached hereto.1.1.2  Contract FM8204/RAM with Notice to Proceed executed January 27, 2003 between Contractor and Buyer, including all exhibits, addenda and appendices thereto (the "Prime Contract").

    1.2    "Buyer" means Washington Area Metropolitan Authority (WMATA).

    1.3    The "Work" means and includes the items set forth in Exhibit I attached hereto.

    1.4    The "Project" is the, furnishing, installation and testing of electrical Equipment in accordance with the terms of the Prime Contract, this Installation Subcontract and Exhibit I hereto.

    1.5    The "Equipment" means and includes all materials and services supplied by Contractor and/or Buyer that are required for completion of the Project.

2.  Priority

    2.1    The Subcontract Documents are complementary.  Insofar as applicable to Subcontractor's performance of the Work, Subcontractor shall be bound by and comply with each and every term of each of the Subcontract Documents as if each term is contained in all the Subcontract Documents.

    2.2    In the event of any conflict between the terms of any of the Subcontract Documents, those terms shall prevail which appear in the document of higher rank according to the order set forth in Section 1.1 hereof.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

3.     Subject Matter

3.1 Subcontractor hereby undertakes to furnish and sell to Contractor the Work and, notwithstanding and in addition to any specific references, conditions or agreements contained herein, to assume for the benefit of Contractor each and every representation, covenant, liability, obligation and guarantee imposed upon Contractor by the Prime Contract with respect to the Work. Subcontractor shall and hereby does indemnify and hold Contractor and its directors, officers, employees and agents harmless from and against any and all damages, losses and claims arising out of or relating to Subcontractor's breach of any of its obligations under this Agreement, including, without limitation, any representation, covenant, liability, obligation or guarantee assumed by Subcontractor hereby, except to the extent attributable to the negligence, act or omission of the Contractor and its directors, officers, employees and agents.  In consideration thereof, Contractor hereby undertakes to purchase the Work from Subcontractor and to pay the Subcontract Price (as hereinafter defined) to Subcontractor in the manner and upon the terms set forth in this Agreement.3.1.1 Subcontractor hereby accepts a Best Effort Disadvantaged Business Enterprise (DBE) Goal of 8.4% of this Subcontract Price.

4.     Term

4.1     This Agreement shall become effective as of the Effective Date.

4.2     The term of this Agreement shall be coextensive with the term of the Prime Contract, unless sooner terminated pursuant to the terms of this Agreement or by mutual written agreement of the parties.

4.3     Time is of the essence of this Agreement.  In order to promote timely completion of the Work without disruption of the Project schedule, Subcontractor shall furnish to Contractor, within 30 days after the Effective Date, a work schedule in a form satisfactory to Contractor and Buyer.  Such schedule and all revisions thereof, shall be based on Equipment shipping dates to which the parties mutually agree.  Such schedule shall be revised only by mutual agreement of Contractor and Subcontractor. Unless otherwise provided for by Section 9.4 hereof, Subcontractor shall not be entitled to additional compensation for complying with this Section 4.3 or with the schedule required to be delivered hereunder or any revisions thereof.

4.4     Subcontractor shall begin the Work no later than the date for start of the Work set forth in the schedule provided under Section 4.3 hereof and shall prosecute and complete the Work in accordance with such schedule, as the same may be revised in accordance with Section 4.3 hereof.

4.5     Subcontractor will be required to create and maintain a field installation project

schedule that will be updated on a monthly basis and submitted to US&S by the 15th of each month for incorporation into the master project schedule provided to WMATA monthly.

5.    Price

5.1    In consideration for the Work, Contractor shall pay to Subcontractor the sum of Nine Hundred Seventy-Three Thousand dollars ($973,000.00) ("Subcontract Price") in accordance with the terms of Article 6 hereof.

5.2    Except as otherwise provided in Articles 9 and 10 of this Agreement, the Subcontract Price represents full and complete compensation to Subcontractor for any and all costs and expenses arising out of Subcontractor's performance of the Work hereunder. Without limiting the generality of the foregoing, the Subcontract Price expressly includes all taxes, duties and fees on materials, labor and services that are furnished for, incorporated into or used in connection with the Work.

6.    Payment

6.1    Contractor shall pay the Subcontract Price to Subcontractor in installments as the Work progresses. The date on which each of such progress payments shall be paid to Subcontractor shall be no later than 10 days after the latest of the following dates: (i) the date of receipt of Subcontractor's invoice by Contractor, (ii) the date of receipt from Subcontractor of those payment documents (if any) which relate to the Work and which are required by the Prime Contract, including but not limited to waivers of liens, and (iii) the date upon which Contractor receives payment from Buyer in accordance with the provisions of the Prime Contract . If any payment is not received by the Contractor from the Buyer within seventy (70) calendar days from when Contractor receives a substantiated and approved invoice from the Subcontractor, and such non – payment is not due to the fault of the Subcontractor, then the Contractor shall be obligated to make such payment to the Subcontractor as if the Buyer had provided funds to the Contractor except if the non-payment to Contractor is due to the unlawful act of the Buyer. All progress payments shall be in U.S. Dollars.

6.2    Within 10 working days after the Effective Date of this Agreement, Subcontractor shall furnish to Contractor an itemized breakdown of the Subcontract Price and a schedule that forecasts the timing and amount of progress payments during the term of this Agreement. Contractor shall use such schedule for financial planning purposes only. Actual payment shall be made in accordance with Section 6.1 hereof.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04 .

6.3    In the event of any material breach by the Subcontractor of any material provision or obligation of this Subcontract, or in the event of the assertion by other parties of any claim or lien against the Contractor or the premises arising out of the Subcontractor's performance of this Subcontract, or if other parties assert any claim or lien against the Contractor, the Contractor shall have the right to retain out of any payments due or to become due to the Subcontractor under this Subcontract an amount sufficient to completely protect the Contractor from any and all loss, damage or expense from any such breach until the breach has been remedied or settled by the Subcontractor to the Contractor's satisfaction.   Subcontractor can, at its sole discretion, provide a bond to Contractor for a sufficient amount to satisfy any lien or claim asserted against "the work" of this subcontract by a third party.  All funds due or owing Subcontractor will be paid upon receipt of bond and no additional amount will be retained or set aside in respect of such lien or claim.

6.4    Contractor also may retain from any progress payment to Subcontractor an amount equivalent to the percentage withheld by Buyer from payments made to Contractor only to the extent that the withholding pertains to the scope of the Work of the Subcontractor.

6.5    Contractor shall pay to Subcontractor any amounts withheld in accordance with Sections 6.3 and/or 6.4 hereof following completion by Subcontractor of all its obligations hereunder, including warranty obligations, in a manner satisfactory to Buyer, release of any corresponding retention by Buyer and execution by Subcontractor of a release of claims in form and substance satisfactory to Contractor. In no event shall Contractor be required to pay any interest on any sum withheld pursuant to the terms of this Article 6 to Subcontractor, any sub-subcontractor or materialman of Subcontractor or any other party.

6.6    Subcontractor shall pay in full all payments due to its subcontractors, materialmen and laborers as the same become due and payable.  In the event Subcontractor fails to timely make any such payment without cause, Contractor shall have the right to make such payment and deduct the amount thereof from any amount due Subcontractor hereunder.  Five (5) days prior to making any such payment, Contractor shall notify Subcontractor and afford Subcontractor the opportunity to promptly raise any payment defenses.

6.7    To the extent permitted by law, Subcontractor hereby waives any right it may have to file a mechanics or materialman's lien against Buyer or Contractor in connection with the Work.

6.8    Any materials furnished by Contractor to Subcontractor, including the Equipment, shall be and remains the property of Contractor.  Title to the Work shall pass to Contractor as payments therefor are made to Subcontractor.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04
PAGE REVISED 5/27/04 (SECTION 6.3)

7.    <u>Performance and Payment Guarantees</u>

At the time of execution and delivery of this Agreement by Subcontractor, Subcontractor shall furnish to Contractor the following security instruments:

7.1    A bond or equivalent security instrument by which is guaranteed Subcontractor's full and complete performance of its obligations under this Agreement. The form of bond or other security instrument and the identity of the surety that issues the same must be approved by Contractor, which approval shall not be unreasonably withheld. The amount of such bond or other security instrument shall equal 100% of the Subcontract Price.

7.2    A bond or equivalent security instrument by which is guaranteed timely payment of Subcontractor's subcontractors, materialmen and laborers who furnish material or services related to Subcontractor's performance of the Work hereunder. The form of bond or other security instrument and the identity of the surety that issues the same must be approved by Contractor, which approval shall not be unreasonably withheld. The amount of such bond or other security instrument shall equal 100% of the Subcontract Price.

8.    <u>Warranties</u>

8.1    Subcontractor warrants that it has and shall have clear title to the materials supplied by it hereunder, and that the Work performed by it is and shall be free and clear of all claims, liens and other encumbrances, except the claim of Subcontractor for the Subcontract Price.

8.2    Subcontractor warrants that the Work shall comply with all applicable requirements set forth in the Subcontract Documents, that all workmanship, fabrication, material and erection shall be free from defects and of merchantable quality, and that all materials furnished by Subcontractor which the Subcontract Documents do not specify by product name and/or manufacturer shall be suitable for their intended purpose.

8.3    Subcontractor undertakes to fulfill the warranty obligations that are imposed upon Contractor by the Prime Contract insofar as such obligations relate to or arise from the Work.

8.4    Except as provided in Section 8.2 hereof, the warranty period for the Work shall be the same as the applicable warranty period specified in the Prime Contract and shall begin upon completion and acceptance of the Work by Contractor and Buyer or, if the Prime Contract so permits, on the date prior to acceptance when the Work is placed in service. Furthermore, if the Prime Contract provides for acceptance of a portion or

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

portions of the Work as the Work progresses, then the warranty period for a portion of the Work shall begin upon completion and acceptance of such portion by Contractor and Buyer or, if the Prime Contract so permits, on the date prior to acceptance when such portion is placed in service.

8.5     Subcontractor, in a timely manner, shall repair, replace or otherwise correct all portions of the Work that breach any of the foregoing warranties at the Work site or at such other location as may be designated by Contractor, without any cost or expense to Contractor or Buyer and in accordance with the warranty provisions of the Prime Contract.

9.     <u>Delay and Liquidated Damages</u>

9.1     Subcontractor shall and hereby does indemnify and hold Contractor harmless from and against all losses and damages which result from Subcontractor's failure to complete the Work, or any portion thereof, on or before the applicable dates set forth in the schedule described in Section 4.3 hereof.

9.2     Subcontractor shall not be liable under Section 9.1 hereof for losses or damages that result from a delay caused by the Contractor or solely from an "excusable cause of delay" (as hereinafter defined). In the event that any losses or damages result in part from a delay caused by the Contractor or an excusable cause of delay, Subcontractor shall be liable under Section 9.1 hereof only for that portion of such losses or damages which are not attributable to the Contractor or an excusable cause of delay.

9.3     For purposes of this Article 9, an "excusable cause of delay" means an event which is recognized as an excusable cause of delay under the Prime Contract, provided that Subcontractor gives written notice thereof to Contractor within ten (10) days after the same becomes known or reasonably should have been known to Subcontractor.

9.4     If Subcontractor is prevented from meeting a date set forth on the schedule described in Section 4.3 hereof as the result of a delay caused by the Contractor or an excusable cause of delay, such date shall be extended by the number of days granted by Buyer in accordance with the terms of the Prime Contract or by the number of days mutually agreed by Contractor and Subcontractor, whichever is greater. When a delay is recognized by the Buyer and Buyer provides a time extension, such time extension shall be the sole adjustment to which Subcontractor is entitled as a result of any such delay; <u>provided</u>, <u>however</u>, that if Contractor obtains from Buyer an equitable adjustment that includes a contract price adjustment pertaining to delay of the Work to be performed by Subcontractor, or if the delay is recognized by the Contractor, Subcontractor shall have the right to a corresponding equitable contract price and/ or

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

time adjustment with Contractor, only to the extent Contractor receives one or both of same from Buyer.

10. <u>Claims</u>

10.1    If Buyer changes, adds to or deletes from the Work within the general scope of the Prime Contract or alters the time for performance thereof, Subcontractor shall be responsible for notifying Contractor of any resulting claim for additional time or compensation.  Unless Subcontractor so notifies Contractor in sufficient time to permit Contractor to submit a claim to Buyer in accordance with the procedures established therefor by the Prime Contract, Subcontractor shall not be entitled to an equitable adjustment.  If Subcontractor so notifies Contractor in a timely manner, Subcontractor's right to an equitable adjustment shall be limited to the equitable adjustment allowed by Buyer or otherwise obtained in accordance with the terms of the Prime Contract.

Provided that Contractor has first added to Subcontractor's claim an amount for Contractor's contribution to the Work or for its supervision, administration, overhead or the like, Contractor shall be entitled to keep any such amount or portion thereof that it has recovered from Buyer due to Subcontractor's claim.

Unless otherwise agreed, Contractor shall present work in conjunction with the Subcontractor for the presentation and prosecution of claims to Buyer.  Subcontractor shall provide at its own expense such information, data and assistance as may be required for presentation and prosecution of each such claim and shall participate at its own expense in any claim or dispute resolution procedure under the Prime Contract insofar as such proceeding involves a claim of Subcontractor.  Any decision with respect to any claim of Subcontractor arising out of any such Prime Contract claim or dispute resolution procedure shall be final, conclusive and binding on Subcontractor.  Subcontractor's participation in such claim or dispute resolution procedure and Subcontractor's recovery (if any) obtained thereby shall constitute a full settlement and discharge of such claim, and Subcontractor shall have no recourse against Contractor for any claim or portion thereof which is denied or not recovered unless the denial or failure to recover is due solely to the gross negligence of Contractor in presenting or prosecuting the claim in accordance with the terms of the Prime Contract.

10.2    Either party may, from time to time and at any time during the term of this Agreement, request a change to this Agreement.  Requests for changes shall be in writing and shall be addressed and delivered to the other party.  Such requests shall be identified as "Contract Change Requests" ("CCRs"), shall carry a sequential number for ease of

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

tracking, shall set forth in detail the nature of the change requested and shall identify the area of Work to be changed.

As soon as practical after receipt of a CCR by a party, both parties shall meet in order to determine the technical, cost and scheduling implications, if any, of such CCR and decide whether to implement such CCR.

If the parties decide to implement a change request, Contractor shall prepare a standard form Contract Change Notice ("CCN"), which CCN shall describe the change, itemize the cost, scheduling and other effects of the change and specify payment terms for any price adjustment. Upon execution of a CCN by both parties, such CCN shall constitute a modification of this Agreement and shall be binding on both parties hereto.

10.3    In the event that a Contractor-generated CCR is caused by any unilateral action of the Buyer permitted under the Prime Contract, and Subcontractor refuses to execute the CCN associated therewith, Contractor shall have the right to unilaterally issue and sign such CCN which shall constitute a modification of this Agreement and shall be binding on both parties hereto. In such unilateral CCN the Contractor will exercise reasonable discretion in establishing the total cost and time impacts of the change, and increase or decrease the Subcontract Price and/or extend or condense the time for performance as appropriate. In case of disagreement with the resolution of the unilateral CCN, the Subcontractor is entitled to dispute resolution, as provided by Article 16 herein.

11.    Subcontractor's Liability

11.1    Subcontractor shall be solely responsible for all losses and damages for all injuries (including death) to persons (including but not limited to employees of Subcontractor, Contractor and Buyer) and damage to property (including but not limited to property of Subcontractor, Contractor and Buyer) arising out of, or resulting from the performance of the Work by Subcontractor, any of its subcontractors, any person directly or indirectly employed by any of them or any other person or entity for whose acts any of them may be liable, except to the extent such injury or damage is caused in part by a party indemnified under this Article 11.

11.2    Subcontractor shall be solely responsible for any and all damage to the Work which occurs prior to acceptance thereof (as defined in the Prime Contract), any and all loss of property (including but not limited to the Equipment) that has been incorporated in the Work prior to acceptance thereof (as defined in the Prime Contract) or that is in the custody or control of Subcontractor prior to completion of the Work, and any and all

repairs and replacements of such Work and property as may suffer such damage or loss.

11.3    Subcontractor shall and hereby does indemnify and hold harmless Contractor and Buyer and their respective directors, officers, employees and agents from and against any and all claims, damages, penalties, losses and expenses (including reasonable attorney's fees) which are sustained by Contractor or Buyer and which are within the scope of Subcontractor's responsibilities as set forth in Sections 11.1 and/or 11.2 hereof.

11.4    Subcontractor shall and hereby does indemnify and hold harmless Contractor and Buyer and their respective directors, officers, employees and agents from and against any and all claims, damages, penalties, losses and expenses (including reasonable attorney's fees) that may be sustained by Contractor or Buyer and that arise from or out of any infringement or alleged infringement of any patents or other intellectual property rights by any invention, documentation, process, material, equipment, article or apparatus, or any part thereof, furnished or installed by Subcontractor or arising from or out of any use by any party, including Buyer, of any such invention, documentation, process, material, equipment, article or apparatus, or any part thereof.

11.5    If requested by Contractor, Subcontractor, at its sole expense, shall defend any claim, suit or action that is brought against Contractor or Buyer and that is within the scope of Subcontractor's responsibilities as set forth in Sections 11.1, 11.2, 11.3 and/or 11.4 hereof; provided that Contractor or Buyer promptly gives to Subcontractor written notice of such claim, suit or action, furnishes to Subcontractor copies of all documents served upon Contractor or Buyer in connection therewith and reasonably cooperates with Subcontractor in such defense. Each of Contractor and Buyer, at its sole expense, shall have the right to be represented in such defense by counsel of its selection.

11.6    Subcontractor shall pay any judgment entered against Contractor or Buyer that is awarded for any claim, suit or action that is within the scope of this Article 11 or any other applicable provision of this Agreement, regardless of whether Subcontractor, Contractor or Buyer directs the defense thereof. Subcontractor shall pay any amount due in settlement or compromise of any such claim, suit or action, provided that, in the case of any settlement or compromise negotiated by Contractor or Buyer, Subcontractor agrees in writing to the terms, including the amount, of such settlement or compromise.

11.7    The indemnification obligations of Subcontractor under this Agreement shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for Subcontractor or any of its subcontractors under

workmen's compensation acts, disability benefit acts or other employee benefit acts, or by the amount or type of insurance which Subcontractor may be required to carry pursuant to Article 12 hereof or may otherwise carry in its discretion.

12.    Insurance

12.1    During the term of this Agreement, Subcontractor shall maintain, at its own expense, with insurers, under forms of policies and with deductibles satisfactory to Contractor, the types and amounts of insurance required of Contractor by the Prime Contract. Each such insurance policy shall include endorsements naming Contractor and Buyer as additional insureds and providing that written notice shall be given to Contractor at least 60 days prior to termination or cancellation of or any material change to such policy. On or before the Effective Date, Subcontractor shall provide to Contractor satisfactory evidence of all such insurance, including a conformed copy of the policy. This provision is in addition to SPECIAL PROVISIONS OF INSURANCE (revised 01/01/2001) from the Prime Contract (Article 2.13.3 of the Prime Contract) which flow down and are incorporated in the Mandatory Contract Inclusions of this Agreement as set forth in Article 20 herein.

13.    Events of Default

13.1    The occurrence of any of the following shall constitute an Event of Default hereunder:

13.1.1    Subcontractor shall fail to prosecute the Work properly or in accordance with the agreed schedule such that satisfactory and timely completion of the Project is delayed, and such failure shall continue for five (5) days after Contractor gives written notice thereof to Subcontractor;

13.1.2    Subcontractor shall fail to pay without cause when due any amount due any of its subcontractors, materialmen or laborers, and such failure shall continue unremedied for a period of five (5) days after Contractor gives written notice of such failure to Subcontractor;

13.1.3    Subcontractor shall fail to perform any of its other obligations without cause hereunder as and when required, and such failure shall continue unremedied for a period of five (5) days after Contractor gives written notice of such failure to Subcontractor;

13.1.4    Subcontractor shall file a lien against Contractor or Buyer in connection with the Work in violation of Section 6.7 hereof;

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

13.1.5    Subcontractor shall become insolvent, shall be unable or shall fail to pay its debts as they become due, shall make an assignment for the benefit of creditors or shall file a petition to take advantage of the insolvency, bankruptcy, reorganization or similar proceedings of any state or other governmental entity; or

13.1.6    A receiver or liquidator shall be appointed for any of Subcontractor's assets, or a petition shall be filed against Subcontractor in an insolvency, bankruptcy, reorganization or similar proceeding, and such petition shall not be withdrawn within seven days after such appointment or filing.

13.2    Upon the occurrence of any Event of Default described in Section 13.1 hereof, Contractor may, without prejudice to any other remedy it may have, at law or in equity, take any of the following actions:

13.2.1    Terminate this Agreement immediately on notice to Subcontractor; or

13.2.2    Remedy the default that forms the basis for the Event of Default and recover from Subcontractor or deduct from any payment(s) due to Subcontractor all reasonable costs and expenses associated with such remedy.

14.    Expediting and Progress of the Work

14.1    The equipment and materials furnished and Work performed under this Agreement shall be subject to expediting by Contractor or its representatives who shall be afforded full and free access to the shops, factories and other places of business of Subcontractor and its lower-tier suppliers and subcontractors for expediting purposes. As required by Contractor, Subcontractor shall provide detailed schedules and progress reports for use in expediting and shall cooperate with Contractor in expediting activities.

14.2    Subcontractor shall be responsible for maintaining job progress in accordance with the Contractor's schedule of performance; provided, however, that the Subcontractor shall be afforded an opportunity to establish activities and working time necessary to perform and complete the work under the subcontract agreement. In the event a revised schedule is issued by the Contractor without Subcontractor's input, Subcontractor shall be allowed reasonable and sufficient time, in accordance with industry standards, in which to complete the phases of the work as they occur. Contractor shall be responsible for providing, within any such schedules issued, reasonable time and proper sequencing of the performance of their subcontractors' work. Provided, further, should changes be required to the scheduled work, Contractor shall promptly notify the Subcontractor of the changes to such scheduled

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

work, and all subsequent changes therein reasonably in advance of the related performance. If any such changes cause Subcontractor to incur additional costs, Subcontractor shall be compensated for same. If at any time Subcontractor's actual progress is inadequate to meet the requirements of this Agreement, Contractor may notify Subcontractor to take such steps as may be necessary to improve its progress. If, within a reasonable period, Subcontractor does not improve performance to meet the Prime Contract milestones or other deadlines reasonably established as set forth above, Contractor may order an increase in Subcontractor's labor force, the number of shifts, overtime operations, additional days of work per week, expedited shipment(s) of equipment and materials, and an increase in the amount of construction plant and equipment.

15.    Termination; Survival

15.1    If Contractor terminates this Agreement pursuant to Article 13 hereof, Contractor may suspend all payments otherwise due to Subcontractor hereunder and finish the Work by such means as Contractor sees fit, deduct from any balance due to Subcontractor hereunder the cost of finishing the Work and pay the excess, if any, to Subcontractor after offset of any and all claims that Contractor has or might have against Subcontractor. In the event the cost of finishing the Work exceeds the balance due Subcontractor hereunder, Subcontractor shall pay such excess to Contractor within five days after invoicing by Contractor. The cost of finishing the Work shall include an additional 15% to cover the supervision and overhead costs of Contractor.

15.2    This Agreement automatically shall terminate upon the effective date of any cancellation or termination of the Prime Contract for any reason. In the event of any such cancellation or termination, Contractor shall notify Subcontractor of such cancellation or termination in writing. Immediately upon receipt of such notice, Subcontractor shall use its best efforts to curtail all charges and commitments and to mitigate all damages attributable to this Agreement and, in any event, Subcontractor shall not be reimbursed for any costs incurred after the termination date set forth in the written notice of termination or for more than 30 days following receipt of such notice, whichever date is later. In the event the Prime Contract is terminated prior to the completion of the Work, Subcontractor shall be paid for the services rendered under this Agreement on the basis of the price breakdown furnished pursuant to Section 6.2 hereof, provided such payment is approved by Buyer.

15.3    Contractor may, at its sole option, terminate for convenience any of the Work under this Agreement in whole or, from time to time, in part, at any time by written notice to the Subcontractor. Such notice shall specify the extent to which the performance of

the Work is terminated and the effective date of such termination. Upon receipt of such notice, the Subcontractor shall:

    a)     immediately discontinue the Work on the date and to the extent specified in the notice and place no further purchase orders or subcontracts for materials, services, or facilities, other than as may be required for completion of such portion of the Work that is not terminated;

    b)     promptly make every reasonable effort to obtain assignment or cancellation upon terms satisfactory to contractor of all purchase orders, subcontracts, rentals, or any other agreements existing for the performance of the terminated work or assign those agreements as directed by Contractor;

    c)     assist contractor in the maintenance, protection, and disposition of Work in progress, plant tools, equipment, property, and materials acquired by Subcontractor or furnished by contractor under this Agreement; and,

    d)     complete performance of such portion of the work that is not terminated.

Upon any such termination for convenience, Subcontractor shall waive any claims for damages, including but not limited to loss of anticipated profits, on account thereof, and as Subcontractor's sole remedy, Contractor shall pay in accordance with the following:

    e)     the Subcontract Price corresponding to the Work performed in strict accordance with this Agreement prior to such notice of termination;

    f)     all reasonable costs for Work thereafter performed as specified in such notice;

    g)     reasonable administrative costs of settling and paying claims arising out of the termination of work under purchase orders or subcontracts;

    h)     reasonable costs incurred in demobilization and the disposition of residual material, plant and equipment; and,

    i)     a reasonable overhead and profit on items f) through h) of this subclause.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

Subcontractor shall submit within thirty (30) days after receipt of the notice of termination, a written statement setting forth its proposal for an adjustment to the Subcontract Price to include only the incurred, and to reasonably be incurred costs described in this clause. Contractor shall review, analyze and verify such proposal and determine an equitable adjustment to the Subcontract Price. In case of disagreement, the Subcontractor is entitled to dispute resolution, pursuant to Article 16 hereof.

15.4    The provisions of Articles 3, 8, 9, 11 and 16 of this Agreement shall survive any expiration or termination of this Agreement, regardless of the reason for such termination.

16.    Disputes

16.1    All disputes arising under this Agreement, and not involving the Buyer, which cannot be resolved by the Contractor's designated Project Manager and the Subcontractor's designated Project Manager, or equivalents, shall in the first instance be referred for final resolution to the Executive Committee. All disputes arising under this Agreement and involving the Buyer shall be governed by the Contract Disputes clause included in Article 20.

16.1.1    The Executive Committee shall be comprised of the Chief Executive Officers, or equivalents, from the Contractor and the Subcontractor, with the authority and responsibility to act on behalf of each with respect to, and to decide all unresolved matters to this Agreement and the Contract and the performance thereof. The Executive Committee member shall have the right to alter any of the obligations or responsibilities of their respective party as set forth in this Subcontract or modifications hereof.

16.1.2    Meetings of the Executive Committee may be called by either the Contractor or the Subcontractor. The Executive Committee may meet, as required, by telephone, video conference, or by any means necessary to expedite the resolution of any issue; however in all disputes the final decision of the Executive Committee must be presented in writing and signed by both parties.

16.2    Subject to Contractor's rights under Section 13.2 hereof, if the parties cannot resolve by mutual agreement any dispute arising in connection with this Agreement, upon written request of either party, the dispute shall be finally settled by arbitration under the Construction Industry Arbitration Rules of the American Arbitration Association by a panel of three arbitrators. Each party shall appoint an arbitrator and the two arbitrators so appointed shall select a third arbitrator. The parties agree that the place of arbitration shall be in the State of Maryland where the work was completed, and the laws of the State of Maryland shall be applied to all procedural and substantive

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

questions.  English shall be the language used in any such arbitration proceeding.  If an award is rendered against any party, any court having jurisdiction thereof may enter judgment on such award.  The prevailing party in any arbitration shall be entitled to recover from the other party any costs incurred by such prevailing party in connection with such arbitration.

16.3     During any such dispute or arbitration proceeding, Contractor shall have the right to direct Subcontractor to continue the Work, subject to the determination of the arbitrators for allocating costs arising from such continuation of the Work.

17.     Notices

All notices or other communications required or permitted to be given under this Agreement shall be in writing and shall be sent by certified or registered mail or overnight courier, with postage prepaid, to any party at the address set forth below for such party (or to such other address as such party shall notify the other party by written notice given in accordance with the provisions of this Article 17):

          If to Contractor:

          Union Switch & Signal Inc.
          1000 Technology Drive
          Pittsburgh, PA  15219
              Attention:  Ms. Paula Pawlak


          If to Subcontractor:

          Sachs Electric
          7941 Woodruff Court
          Springfield, VA  22151

          Attention:     Charles Wooldridge


18.     Excusable Delays

If Subcontractor's performance of this Agreement is prevented or delayed by any cause, existing or future, which is beyond the reasonable control of the parties and without the fault or negligence of Subcontractor, Subcontractor shall, within ten (10) days of the

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

commencement of any such delay, give to Contractor written notice thereof and within a reasonable period of time of the commencement of the delay, a written description of the anticipated impact of the delay on performance of the Work. Delays attributable to and within the control of Subcontractor's suppliers or subcontractors of any tier shall be deemed delays within the control of the Subcontractor. Within twenty (20) days after the termination of any excusable delay, Subcontractor shall file a written notice with Contractor specifying the actual duration of the delay. Failure to give any of the above notices shall be sufficient ground for denial of an extension of time. If Contractor determines that the delay was, beyond the reasonable control and without the fault or negligence of Subcontractor, Contractor will determine the duration of the delay and will extend the time of performance of this Agreement accordingly. In case of disagreement, the Subcontractor shall be entitled to dispute resolution, pursuant to Article 16 herein.

19.    Miscellaneous

19.1    The individual designated by each party in Article 17 hereof is hereby declared to be the Authorized Representative of such party for all purposes related to this Agreement. Such Authorized Representative shall have sole and complete authority to bind, in writing, its principal with respect to matters arising under this Agreement. At any time during the term of this Agreement, a party may appoint a different Authorized Representative by providing written notice thereof to the other party.

19.2    No cancellation, modification, amendment, deletion, addition or other change of or to this Agreement or any provision hereof, or waiver or any right or remedy provided for herein, shall be effective for any purpose unless specifically set forth in writing and signed by the party to be bound thereby. No waiver of any right or remedy in respect of any occurrence or event on one occasion shall be deemed a waiver of such right or remedy in respect of such occurrence or event on any other occasion.

19.3    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Subcontractor may not assign this Agreement or any of its rights or obligations hereunder, whether voluntarily or by operation of law, without the prior written consent of Contractor, which consent shall not be unreasonably withheld.

19.4    Subcontractor shall comply with, and be solely responsible for violations of, any and all statutes, ordinances, rules and regulations of every government, whether national, state or local, and of every agency of such government, which relates to or in any manner affects the performance of the Work hereunder.

19.5    This Agreement constitutes the entire agreement between the parties and supersedes any prior understandings, agreements or representations by or between the parties,

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

written or oral, to the extent they relate to the subject matter hereof. This Agreement may be executed in any number of counterparts and by the parties on different counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

19.6    Any provision of this Agreement that is prohibited by or unlawful or unenforceable under any applicable law of any jurisdiction shall be ineffective as to such jurisdiction without affecting any other provision of the Agreement. To the full extent, however, that the provision of such applicable law may be waived, it is hereby waived, to the end that the Agreement shall be deemed to be a valid and binding agreement enforceable in accordance with its terms.

19.7    This Agreement shall be subject to, governed by and interpreted in accordance with the laws of the State of Maryland, without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Pennsylvania or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Maryland.

20.    Mandatory Contract Clause Inclusions

Notwithstanding Article 1.1.2 incorporation of the Contract in this Agreement, the Buyer requires the following General and Special Provisions be inserted and made a part of this Agreement:

**20.1    CONTRACT ADMINISTRATION REQUIREMENTS:**

The following requirements apply after contract award:

A.    The Contractor shall include the following provision in each subcontract it awards in support of the Appendix B, DBE goal:

The contractor shall not discriminate on the basis of race, color, national origin or sex in the performance of this contract. The contractor shall carry out applicable requirements of 49 CFR Part 26 in the award and administration of US DOT assisted contracts. Failure by the contractor to carry out these requirements is a material breach of this contract, which may result in termination of this contract or such other remedy as the Buyer deems appropriate.

B.    The Contractor shall monitor the performance of, collect and report data on DBE participation to the Office of Civil Rights, on the attached "Prompt Payment Report-Prime Contractor's Report" (page B-20) and "Prompt Payment Report-Subcontractor's Report" (Page B-21), which shall be submitted monthly with each payment request. Failure to submit these reports may result in suspension of contract payments. The Contractor shall certify with each payment request that payment has been or will be made to all subcontractors due payment, within ten (10) days after receipt of payment from the Authority for work by that subcontractor. The Contractor shall inform the COR or AR, with their payment request, of any situation in which

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

scheduled subcontractor payments have not been made.

C.    The Contractor shall have a continuing obligation to maintain a schedule for participation by DBE contractor(s) to meet its goal set forth above in this Appendix. The Contractor shall not have work performed nor the materials or supplies furnished by any individual or firm other than those named in the "Schedule of DBE Participation". If at any time, the Contractor believes or has reason to believe that it needs to obtain a substitute for a DBE contractor named in the "Schedule of DBE Participation", the Contractor shall, within ten (10) days, notify the contracting officer or other delegated authority's representative of that fact in writing. Situations which may warrant substitution for a DBE firm include, but are not limited to the following:

(1)    Failure to qualify as a DBE.

(2)    Death or physical disability, if the named subcontractor or DBE partner of the joint venture is an individual.

(3)    Dissolution, if a corporation or partnership.

(4)    Bankruptcy of the subcontractor, subject to applicable bankruptcy law, and only instances where the bankruptcy affects the Contractor's ability to perform.

(5)    Inability to furnish a reasonable performance or payment bond, if required.

(6)    Inability to obtain, or loss of, a license necessary for the performance of the particular category of work.

(7)    Failure or inability to comply with a requirement of law applicable to contractors and subcontractors on a construction, alteration or repair project.

(8)    Failure or refusal to execute the subcontract in accordance with the terms of an offer submitted to the Contractor prior to the Contractor's submission of its bid/proposal, but only where the contracting officer or other delegated authority's representative can ascertain with reasonable certainty the terms of such offer. In the absence of any other factors, such a failure or refusal will be considered an unusual situation only if the bidder/proposer obtained, prior to bidding/proposing, an enforcement commitment from the subcontractor involved.

(9)    Failure to comply with the terms and conditions of this Contract or those of its subcontract or joint venture agreement.

Within 30 days thereafter, the Contractor shall, if necessary to achieve the Appendix B goal, make every reasonable effort to subcontract the same or other work to other DBE

firms. The Contractor must have the prior written approval of the contracting officer or other delegated authority's representative and the Office of Civil Rights before substitution for a DBE subcontractor, regardless of the reason for substitution. Failure to obtain Authority approval could result in the Contractor being found non-compliant with the requirements of Appendix B.

D.     The contractor shall forward copies of all subcontracts to the Office of Civil Rights at the time of their execution.

E.     If the contracting officer or other delegated authority's representative determines that the Contractor has failed to comply with this Appendix B, he will notify the Contractor of such non-compliance and the action to be taken. The Contractor shall, after receipt of such notice, take corrective action. If the Contractor fails or refuses to comply promptly, the contracting officer or other delegated authority's representative may issue a "stop work order" stopping all or part of the work until satisfactory corrective action has been taken. No part of the time lost due to any such stop work order shall be made the subject of claim for extension of time or for excess costs or damages by the Contractor. When the Authority proceeds with such formal actions, it has the burden of proving that the Contractor has not met the requirements of this Appendix, but the Contractor's failure to meet its Appendix B goal shall shift to it the requirement to come forward with evidence to show that it has met the good faith requirements of this Appendix. Where the Contractor, after exhausting all its administrative and legal remedies and procedures is found to have failed to exert a "good faith effort" to involve DBE's in the work as herein provided, the Authority may declare the Contractor ineligible to receive further Authority contracts for three years from the date of the finding.

F.     The Contractor agrees to cooperate in any studies or surveys as may be conducted by the Authority which are necessary to determine the extent of the Contractor's compliance with this Appendix.

G.     The Contractor shall keep records and documents for two years following performance of this Contract to indicate compliance with this Appendix. These records and documents, or copies thereof, shall be made available at reasonable times and places for inspection by any authorized representative of the Authority and will be submitted upon request together with any other compliance information which such representative may require.

H.     If the Authority, the FTA or the US DOT has reason to believe that any person or firm has willfully and knowingly provided incorrect information or made false statements regarding the DBE Program, the matter shall be referred to the Office of Civil Rights.

DRAFT COPY -- JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

I.      Failure by the Contractor to carry out the requirements of this Appendix is a material breach of this Contract, which may result in the termination of this Contract under the Default provision of this Contract or such other remedy as the Authority deems appropriate.

## 20.2    NOTICE TO THE AUTHORITY OF LABOR DISPUTES:

a.      Whenever the Contractor has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this Contract, the Contractor shall immediately give notice thereof, including all relevant information with respect thereto, to the Contracting Officer or other delegated Authority's Representative.

b.      The Contractor agrees to insert the substance of this Article, including this Paragraph b., in any subcontract hereunder as to which a labor dispute may delay the timely performance of this Contract; except that each such subcontract shall provide that in the event its timely performance is delayed or threatened by delay by any actual or potential labor dispute, the subcontractor shall immediately notify his next higher tier subcontractor, or the Contractor, as the case may be, of all relevant information with respect to such dispute.

## 20.3    CIVIL RIGHTS   (Revised October 20, 2000)

a.      Nondiscrimination: In accordance with Title VI of the Civil Rights Act, as amended, 42. U.S.C. §2000d, section 303 of the Age Discrimination Act of 1975, as amended, 42 U.S.C. §6102, section 202 of the American with Disabilities Act of 1990, 42 U.S.C. §12132, and Federal transit law at 49 U.S.C. §5332, the contractor agrees that it will not discriminate against any employee or applicant for employment because of race, color, creed, national origin, sex, age, or disability.  In addition, the Contractor agrees to comply with applicable Federal implementing regulations and other implementing regulations that FTA may issue.

b.      Equal Employment Opportunity: The following equal employment opportunity requirements apply to this contract.

(1)     Race, Color, Creed, National Origin, and Sex: In accordance with Title VII of the Civil Rights Act, as amended 42. U.S.C. §2000e, and Federal transit laws at 49 U.S.C. §5332, the Contractor agrees to comply with all applicable equal opportunity requirements of the U. S. Department of Labor (U.S. DOL) regulations, "Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor, " 41 C.F.R. Parts 60 et seq., (which implement Executive Order No. 11246, "Equal Employment Opportunity," as amended by Executive Order No. 11375, "Amending

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

Executive Order 11246 Relating to Equal Employment Opportunity," 42 U.S.C. 2000e note), and with any applicable Federal statutes, executive orders, regulations, and Federal policies that may in the future affect construction activities undertaken in the course of the Contract. The Contractor agrees to take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, creed, national origin, sex or age. Such action shall include, but not be limited to, the following: employment, upgrading, demotion or transfer; recruitment or recruitment advertising, layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. In addition, the Contractor agrees to comply with any implementing requirements FTA may issue.

    (2)    Age: In accordance with Section 4 of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 623 and Federal transit law at 49 U.S.C. §5332, the Contractor agrees to refrain from discrimination against present and prospective employees for reason of age. In addition, the Contractor agrees to comply with any implementing requirements FTA may issue.

    (3)    Disabilities: In accordance with section 102 of the Americans with Disabilities Act, as amended, 42 U.S.C. §12112, the Contractor agrees that it will comply with the requirements of U. S. Equal Employment Opportunity Commission, "Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act," 29 C.F.R. Part 1630, pertaining to employment of persons with disabilities. In addition, the Contractor agrees to comply with any implementing requirements FTA may issue.

c.    The Contractor also agrees to include these requirements in each subcontract financed in whole or in part with Federal assistance provided by FTA, modified only if necessary to identify the affected parties.

## 20.4    NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT:

a.    The Contractor shall report to the Contracting Officer or other delegated Authority's Representative, promptly and in reasonable written detail, each notice or claim of patent or copyright infringement based on the performance of this Contract of which the Contractor has knowledge.

b.    In the event of any claim or suit against the Authority on out of the use of any supplies

furnished or work or services performed hereunder, the Contractor shall furnish to the Authority, when requested by the Contracting Officer or other delegated Authority's Representative, all evidence and information in possession of the Contractor pertaining to such suit or claim. Such evidence and information shall be furnished at the expense of the Authority except where the Contractor has agreed to indemnify the Authority.

c.       This Article shall be included in all subcontracts.

## 20.5 AUDIT AND INSPECTION OF RECORDS:

a.       This Article is applicable if this Contract was entered into by means of negotiation and shall become operative with respect to any modification to this Contract whether this Contract was initially entered into by means of negotiation or by means of formal advertising.

b.       The Contractor shall maintain records, and the Contracting Officer or other delegated Authority's Representative, the U.S. Department of Transportation, and the Comptroller General of the United States or any of their duly authorized representatives shall, until the expiration of three years after final payment under this Contract, have access to and the right to examine any directly pertinent books, documents, papers and records of the Contractor, involving transactions related to this Contract, for the purpose of making audit, examination, excerpts and transcriptions.

c.       The Contractor further agrees to include in all his subcontracts hereunder a provision to the effect that the subcontractor agrees that the Contracting Officer or other delegated Authority's Representative, the U.S. Department of Transportation and the Comptroller General of the United States or any of their duly authorized representatives shall, until the expiration of three years after final payment under the Contract, have access to and the right to examine any directly pertinent books, documents, papers and records of such subcontractor, involving transactions related to the subcontract, for the purpose of making audit, examination, excerpts and transcriptions.

## 20.6    PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA - PRICE ADJUSTMENTS:

a.       This Article shall become operative only with respect to any modification of this Contract which involves aggregate increases and/or decreases in cost plus applicable profits in excess of $100,000 unless the modification is priced on the basis of adequate competition, established catalog or market prices of commercial items sold in substantial quantities to the general public, or prices set by law or regulation. The right to price reduction under this Article is limited to defects in data relating to such modification.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

b.    If any price, including profit or fee, negotiated in connection with any price adjustment under this Contract was increased by any significant sums because:

(1)    The Contractor furnished cost or pricing data which was not complete, accurate and current as certified in the Contractor's Certificate of Current Cost or Pricing Data;

(2)    A subcontractor, pursuant to the Article of this Contract entitled SUBCONTRACTOR COST AND PRICING DATA AND PRICE ADJUSTMENTS or any subcontract article therein required, furnished cost or pricing data which was not complete, accurate and current as certified in the subcontractor's Certificate of Current Cost or Pricing Data;

(3)    A subcontractor or prospective subcontractor furnished cost or pricing data which was required to be complete, accurate and current and to be submitted to support a subcontract cost estimate furnished by the Contractor but which was not complete, accurate and current as of the date certified in the Contractor's Certificate of Current Cost or Pricing Data; or

(4)    The Contractor or a subcontractor or prospective subcontractor furnished any data, not within Paragraph (1), (2) or (3) above, which was not accurate, as submitted; the price shall be reduced accordingly and the Contract shall be modified in writing as may be necessary to reflect such reduction.

However, any reduction in the Contract price due to defective subcontract data of a prospective subcontractor, when the subcontract was not subsequently awarded to such subcontractor, will be limited to the amount, plus applicable overhead and profit markup, by which the actual subcontract, or actual cost to the Contractor if there was not a subcontract, was less than the prospective subcontract cost estimate submitted by the Contractor, provided the actual subcontract price was not affected by defective cost or pricing data. (Note: Since the Contract is subject to reduction under this Article by reason of defective cost or pricing data submitted in connection with certain subcontracts, it is expected that the Contractor may wish to include an article in each such subcontract requiring the subcontractor to appropriately indemnify the Contractor. However, the inclusion of such an article and the terms thereof are matters of negotiation and agreement between the Contractor and the subcontractor, provided that they are consistent with DISPUTES provisions in subcontracts. It is also expected that any subcontractor subject to such indemnification will generally require substantially similar indemnification for defective cost or pricing data required to be submitted by his lower tier subcontractors.)

**20.7    AUDIT - PRICE ADJUSTMENTS:**

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

a.      General:  The Contracting Officer or other delegated Authority's Representative shall have the audit and inspection rights described in the applicable Paragraphs b., c. and d. below.

b.      Examination of costs: If this is a cost-reimbursement type, incentive, time and materials, labor hour or price redeterminable Contract, or any combination thereof, the Contractor shall maintain, and the Contracting Officer or other delegated Authority's Representative shall have the right to examine books, records, documents and other evidence and accounting procedures and practices, sufficient to reflect properly all direct and indirect costs of whatever nature claimed to have been incurred for the performance of this Contract. Such right of examination shall include inspection at all reasonable times of the Contractor's plants, or such parts thereof, as may be engaged in the performance of this Contract.

c.      Cost or pricing data: If the Contractor submitted cost or pricing data in connection with the pricing of this Contract or any change or modification thereto, unless such pricing was based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities to the general public, or prices set by law or regulation, the Contracting Officer or other delegated Authority's Representative shall have the right to examine all books, records, documents and other data of the Contractor related to the negotiation, pricing or performance of such Contract, change or modification, for the purpose of evaluating the accuracy, completeness and currency of the cost or pricing data submitted. The right of examination shall extend to all documents necessary to permit adequate evaluation of the cost or pricing data submitted along with the computations and projections used therein.

d.      Not used.

e.      The Contractor shall insert a clause containing all the provisions of this Article, including this Paragraph e., in all subcontracts hereunder except altered as necessary for proper identification of the contracting parties and the Contracting Officer or other delegated Authority's Representative under this Contract.


**20.8    SUBCONTRACTOR COST OR PRICING DATA AND PRICE ADJUSTMENTS:**

a.      Paragraphs b. and c. of this Article shall become operative only with respect to any change or other modification made pursuant to one or more provisions of this Contract which involves a price adjustment in excess of $100,000.  The requirements of this Article shall be limited to such price adjustments.

b.      The Contractor shall require subcontractors hereunder to submit cost or pricing data under the following circumstances:

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

(1)    Prior to award of any cost-reimbursement type, incentive, or price re-determinable subcontract;

(2)    Prior to the award of any subcontract the price of which is expected to exceed $100,000;

(3)    Prior to the pricing of any subcontract change or other modification for which the price adjustment is expected to exceed $100,000; except in the case of (2) or (3) where the price is based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities to the general public or prices set by law or regulation.

c.    The Contractor shall require subcontractors to certify that to the best of their knowledge and belief the cost and pricing data submitted under Paragraph b. above is accurate, complete and current as of the date of execution, which date shall be as close as possible to the date of agreement on the negotiated price of the Contract modification.

d.    The Contractor shall insert the substance of this Article including this Paragraph d. in each subcontract hereunder which exceed $100,000.

## 20.9    VALUE ENGINEERING INCENTIVE:

a.    This Article applies to those Value Engineering Change Proposals (VECP's) which are initiated and developed by the Contractor to change the Drawings, Specifications or other requirements of this Contract.  In order to be accepted under this Article each VECP shall:

(1)    Be identified by the Contractor at the time of submittal to the Contracting Officer or other delegated Authority's Representative as submitted pursuant to this Article using the prescribed WMATA VECP proposal form;

(2)    Require a change to this Contract.

(3)    Decrease the Contract price;

(4)    Maintain the Contract requirements such as safety, service life, reliability, economy of operation, ease of maintenance and necessary standardized and architectural features of the facility or system, and;

(5)    Not require an unacceptable extension of original Contract duration.

(6)    Be reviewed and evaluated by way of a two-phase process.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

-25-

b.    Phase One - Conditional Approval: In addition to the use of the WMATA VECP proposal form, any VECP the Contractor submits shall be in sufficient detail to clearly define the proposed change including the following items:

(1)    A description of the difference between the existing and the proposed Contract requirements, and the comparative advantages and disadvantages of each;

(2)    Contract requirements recommended by the Contractor to be changed;

(3)    Separate detailed cost estimates for both the basic Contract requirement and the proposed change, and an estimate of the change in Contract price including an accounting of the costs of development and implementation and Authority review of the VECP and the sharing arrangement as set forth in the following Paragraph e.;

(4)    A statement from the Contractor predicting any effects the proposed VECP will have on the life-cycle cost of the work to include and identify separately the cost for increased maintenance and operations;

(5)    A statement of the time by which the proposal must be accepted so as to obtain the maximum price reduction effect and not delay the original Contract completion time. The time required for VECP review shall be considered and included in this statement and also in a separate bar chart;

(6)    A list of codes and WMATA standards applicable to the work to be carried out by the VECP and a statement that the proposed VECP will be in compliance with the requirements set forth in listed codes and standards;

(7)    The identification of a project where the materials, methods of construction and special equipment, where required, have been previously and successfully performed on construction similar to that which is being proposed for implementation on this Contract; and

(8)    Preliminary architectural and engineering analysis, including calculations and 22 x 34 inch drawings in sufficient detail for each requirement of the Contract which must be changed if the VECP is accepted, with recommendations for accomplishing each change and its effect on unchanged work.

c.    The Contracting Officer or other delegated Authority's Representative may at any time during the two-phase review and evaluation process reject part or all of the VECP by giving the Contractor written notice thereof. Until final approval is issued, the Contractor shall remain obligated to perform in accordance with the terms of the original Contract. VECP's will be processed expeditiously; however, the Authority shall not be liable for any delay in acting upon any proposal submitted pursuant to this Article. The decision of the Contracting Officer or other delegated Authority's Representative about acceptance or rejection of any such proposal shall be final and shall not be subject to the DISPUTES Article of this Contract.

(1)    The Contractor has the right to withdraw part or all of the VECP at any time prior to

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

acceptance or rejection by the Contracting Officer or other delegated Authority's Representative. Such withdrawal shall be made in writing to the Contracting Officer or other delegated Authority's Representative. If the Contractor desires to withdraw the proposal, he shall be liable for the cost incurred by the Authority in reviewing the proposal.

d.     Upon notice of conditional approval of the concept of the VECP, the Contractor shall proceed with final VECP design in accordance with the agreed schedule.

e.     Phase Two - Final Approval: Final approval of the VECP by the Authority will be contingent upon the following items:

(1)     The Contractor shall address, to the Authority's satisfaction, all design issues and review comments.

(2)     An equitable adjustment in the Contract price and appropriate changes in any other affected provisions of the Contract shall be made and the Contract modified in accordance with this Article and the CHANGES or other applicable articles of this Contract.

(3)     The net savings resulting from the change shall be shared between the Contractor and the Authority on the basis of 50 percent for the Contractor and 50 percent for the Authority. Net savings shall be determined by deducting from the estimated gross savings, the Contractor's costs of developing and implementing the proposal, including any amount attributable to a subcontractor, and the estimated amount of increased costs to the Authority resulting from the change, such as costs for review, implementation, inspection, related items and Authority-furnished property. Estimated gross savings shall include Contractor's labor, material, equipment, overhead, profit and bond. The Contract price shall be reduced by the sum of the Authority's costs and share of the net savings.

(4)     The Contractor is entitled to share in instant Contract savings only, to the full extent provided for in this Article. For purposes of sharing, the term 'instant contract' shall not include any supplemental agreements to or other modifications of this Contract, executed subsequent to acceptance of the particular VECP, by which the Authority increases the quantity of any item or adds any item.

(5)     Notwithstanding any review, approval or acceptance of any VECP by the Authority; the Contractor agrees to be liable to the Authority for all costs of any kind whatsoever caused by or resulting from any error, omission, deficiency or negligence, or combination thereof, of any kind in the design, drawings or specifications submitted to the Authority in connection with any VECP proposal under this Contract. The rights and remedies of the Authority provided in this clause are in addition to any other rights or remedies provided by law or under this Contract.

f.     The Contractor will use his best efforts to include Value Engineering arrangements in any subcontract, which in his judgement, appears to offer sufficient value engineering potential.

g.     A VECP identical to one submitted under any other contract, by this or any other Contractor, may also be submitted under this Contract.

h.     The Contractor may restrict the Authority's right to use any VECP data by marking it with the following statement:

"This data, furnished pursuant to the VALUE ENGINEERING INCENTIVE Article of this Contract, shall not be duplicated, used or disclosed, in whole or in part, for any purpose except to evaluate the VECP, unless the proposal is accepted by the Authority. This restriction does not limit the Authority's right to use information contained in this data if it is or has been obtained, or is otherwise available, from the Contractor or from other source, without limitations. When this proposal is accepted by the Authority, the Authority shall have the right to duplicate, use and disclose any data in any manner and for any purpose whatsoever, and have others do so whether under this or any other Authority contract."

## 20.10    ACCOUNTING AND RECORD KEEPING:

a.      Applicability.  This Article shall become effective for and shall apply to any adjustment in the price of this Contract initiated by the Contractor or the Authority. However, where the original amount of this Contract is less than $1,000,000, Paragraph c. of this Article does not apply unless the adjustment is expected to exceed $50,000.

b.      Forward Priced Adjustments.  Unless expressly waived in writing in advance by the Contracting Officer or other delegated Authority's Representative, the Contractor shall furnish to the Contracting Officer or other delegated Authority's Representative a cost proposal in advance of performance of any work for which a price adjustment is requested under this Contract.  The proposal format shall be as detailed in the CONTRACT MODIFICATIONS - REQUIREMENTS FOR PROPOSALS, PRICE BREAKDOWN AND NEGOTIATION OF PROFIT Article.  The Contractor shall initiate such records as are necessary to substantiate all elements of the pricing proposal, current to the date of agreement on the pricing adjustment.  Such records supporting the costs of each pricing adjustment request shall be specifically segregated and identified in the Contractor's accounting system as being applicable to the pricing adjustment request.

c.      Post Pricing Adjustments.  In addition to the records required to be originated under b. above, in the event pricing of an adjustment under this Contract is not agreed upon between the Contractor and the Contracting Officer or other delegated Authority's Representative prior to the commencement of work for which the pricing adjustment is requested, the Contractor and any subcontractor engaged in work for which the pricing adjustment is requested, shall maintain accounts and original cost records specifically segregated and identified by job order or other appropriate accounting procedures approved by the Contracting Officer or other delegated Authority's Representative of all incurred segregable costs related to the work for which the pricing adjustment is requested.  The Contractor shall maintain accounts and records which segregate and account for the costs of all work associated with that part of the project for which the pricing adjustment is requested and shall allocate between (1) work required under the base Contract; (2) work requested to be reimbursed under the pricing adjustment; and (3) other claim, including but not limited to, changes, differing site

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

conditions, and the like. The accounts and records so established shall accumulate such costs under logical costs groups, such as material, labor, equipment, subcontracts, field overhead and the like. The Contractor shall record these costs on a form approved by the Contracting Officer or other delegated Authority's Representative. Subject to agreement between the Contractor and the Contracting Officer or other delegated Authority's Representative, or upon direction of the Contracting Officer or other delegated Authority's Representative for work under the TIME AND MATERIALS WORK Article, the Contractor shall use Form C-113 (Daily Report - Labor, Materials and Equipment). The terms of Paragraph d. of the TIME AND MATERIALS WORK Article of this Contract shall apply regardless of the form used.

d.    Availability. The accounts, records and costs information required to be originated under b. and c. above together with all other accounts, records and costs information related to this Contract shall be maintained and made available by the Contractor or subcontractor(s):

(1)    At the office of the Contractor or subcontractor(s) at all reasonable times for inspection, audit, reproduction or such other purposes as may be required by the Contracting Officer or other delegated Authority's Representative, or pursuant to any other provisions of this Contract;

(2)    Until the expiration of three years from the date of payment of the final $100 (final payment) under this Contract or such lesser time as is specified in Subpart 4.7 of the Federal Acquisition Regulations and for such longer period, if any, as is required by applicable statute, or by any other articles of this Contract, or by Paragraphs (a) and (b) below:

(a)    If the Contract is completely or partially terminated, for a period of three years from either the date of any resulting final settlement or the date of final payment, whichever is the greater period; and

(b)    If a pricing adjustment is involved in any appeal under the DISPUTES Article of this Contract or in any litigation related to this Contract, for a period of one (1) year following the final disposition of the appeal or litigation.

e.    When asserting a claim under the various provisions of this Contract, the Contractor shall grant the Authority access to review and ascertain the validity of the accounting records being maintained for segregation of costs, including base cost records, and to audit such costs as are deemed appropriate by the Contracting Officer or other delegated Authority's Representative. No payment shall be made to the Contractor on its claim until such records are made available and access is permitted.

f.    Limitation on Pricing Adjustment. In the event the Contractor or any subcontractor fails to originate or to maintain, or to make available any accounts or records as required

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

under this or any other article of the Contract, any pricing adjustment or portion thereof previously granted by the Contracting Officer or other delegated Authority's Representative for which records are not available shall be rescinded and recomputed, or if a pricing adjustment has not yet been granted shall be computed, in an amount not to exceed the direct costs for which accounts or records are not available, plus a single mark-up for indirect expenses not to exceed 10 percent of the direct costs so determined by the Contracting Officer or other delegated Authority's Representative. The adjustment will be established by the Contracting Officer or other delegated Authority's Representative based upon, at his or her election, either:

(1)      An audit of any existing books and records of the Contractor or subcontractor; or (2) an Authority estimate adopted by the Contracting Officer or other delegated Authority's Representative; or (3) a combination of (1) and (2); plus a single mark-up for indirect expenses not to exceed 10 percent of the direct costs so determined by the Contracting Officer or other delegated Authority's Representative. The Contractor and subcontractors shall not be allowed any profit for the work for which the Contractor or subcontractor fails to originate, or to maintain, or to make available any accounts or records as required under this Contract.

g.      The Contractor shall insert a clause containing all the provisions of this Article in all subcontracts issued under this Contract, modified as necessary, for proper identification of the contracting parties and the Contracting Officer or other delegated Authority's Representative under this Contract.

## 20.11   CARGO PREFERENCE, USE OF UNITED STATES-FLAG VESSELS:

a.      Pursuant to Pub. L. 664 (46 U.S.C. 1241(b)):

"Cargo Preference - Use of United States-Flag Vessels

The Contractor agrees:

(1)      To utilize privately owned United States-flag commercial vessels to ship at least 50 percent of the gross tonnage (computed separately for dry bulk carriers, dry cargo liners and tankers) involved, whenever shipping any equipment, materials or commodities pursuant to this Contract, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels.

(2)      To furnish within 20 days following the date of loading for shipments originating within the United States, or within 30 working days following the date of loading for shipments originating outside the United States, a legible copy of a rated on-board commercial ocean bill-of-lading in English for each shipment of cargo described in paragraph (1) above to the

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

Grantee (through the prime Contractor in the case of subcontractor bill-of-lading) and to the Division of National Cargo, Office of Market Development, Maritime Administration, Washington, D.C. 20230, marked with appropriate identification of the Project.

(3)    To insert the substance of the provisions of this Article in all subcontracts issued pursuant to this Contract."

## 20.12    LABOR PROVISIONS:

(1)    **Minimum Wages**

(a)    All laborers and mechanics employed or working upon the site of the work (or under the United States Housing Act of 1937 or under the Housing-Act of 1949 in the construction or development of the project), will be paid unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account (except such payroll deductions as are permitted by regulations issued by the Secretary of Labor under the Copeland Act, 29 C.F.R. Part 3), the full amount of wages and bona fide fringe benefits (or cash equivalents thereof) due at the time of payment computed at rates not less than those contained in the wage determination of the Secretary of Labor which is attached hereto and made a part hereof, regardless of any contractual relationship which may be alleged to exist between the Contractor and such laborers and mechanics.

Contributions made or costs reasonably anticipated for bona fide fringe benefits under Section 1(b) (2) of the Davis-Bacon Act on behalf of laborers or mechanics are considered wages paid to such laborers or mechanics, subject to the provisions of 29 C.F.R. §5.5(a)(1)(iv); also, regular contributions made or costs incurred for more than a weekly period (but not less often than quarterly) under plans, funds, or programs that cover the particular weekly period, are deemed to be constructively made or incurred during such weekly period. Such laborers and mechanics shall be paid the appropriate wage rate and fringe benefits on the wage determination for the classification of work actually performed, without regard to skill, except as provided at 29 C.F.R. §5.5(a)(4). Laborers or mechanics performing work in more than one classification may be compensated at the rate specified for each classification for the time actually worked therein, provided, that the employer's payroll records accurately set forth the time spent in each classification in which work is performed. The wage determination (including any additional classification and wage rates conformed under 29 C.F.R. §5.5(a)(1)(ii) And the Davis-Bacon poster (WH-1321) shall be posted at all

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

times by the Contractor and its Subcontractor at the site of the work in a prominent and accessible place where it can be easily seen by the workers.

(b)    1.    The Contracting Officer or other delegated Authority's Representative shall require that any class of laborers or mechanics which is not listed in the wage determination and which is to be employed under the contract shall be classified in conformance with the wage determination. The Contracting Officer or other delegated Authority's Representative shall approve an additional classification and wage rate and fringe benefits therefore only when the following criteria have been met:

a.    The work to be performed by the classification requested is not performed by a classification in the wage determination; and

b.    The classification is utilized in the area by the construction industry; and

c.    The proposed wage rate, including any bona fide fringe benefits, bears a reasonable relationship to the wage rates contained in the wage determination.

2.    If the Contractor and the laborers and mechanics to be employed in the classification (if known), or their representatives, and the Contracting Officer or other delegated Authority's Representative agree on the classification and wage rate (including the amount designated for fringe benefits where appropriate), a report of the action taken shall be sent by the Contracting Officer or other delegated Authority's Representative to the Administrator of the Wage and Hour Division, Employment Standards Administration, Washington, D.C. 20210. The Administrator, or an authorized representative, will approve, modify, or disapprove every additional classification action within 30 days of receipt and so advise the Contracting Officer or other delegated Authority's Representative or will notify the Contracting Officer or other delegated Authority's Representative within the 30-day period that additional time is necessary.

3.    In the event the Contractor, the laborers or mechanics to be employed in the classification or their representatives, and the Contracting Officer or other delegated Authority's Representative do not agree on the proposed classification and wage rate (including the amount designated for fringe benefits, where appropriate), the Contracting Officer or other delegated Authority's Representative shall refer the questions, including the views of all interested parties and the recommendation of the Contracting Officer or other delegated Authority's Representative to the administrator for determination.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

The Administrator, or an authorized representative, will issue a determination with 30 days of receipt and so advise the Contracting Officer or other delegated Authority's Representative or will notify the Contracting Officer or other delegated Authority's Representative within the 30-day period that additional time is necessary.

4.      The wage rate (including fringe benefits where appropriate) determined pursuant to General Provision 23(1)(b)2 or General Provision 23 (1)(b) 3, shall be paid to all workers performing work in the classification under this contract from the first day on which work is performed in the classification.

(c)     Whenever the minimum wage rate prescribed in the contract for a class of laborers or mechanics includes a fringe benefit which is not expressed as an hourly rate, the Contractor shall either pay the benefit as stated in the wage determination or shall pay another bona fide fringe benefit or an hourly cash equivalent thereof.

(d)     If the Contractor does not make payments to a trustee or other third person, the Contractor may consider as part of the wages of any laborer or mechanic the amount of any costs reasonably anticipated in providing bona fide fringe benefits under a plan or program, provided, that the secretary of labor has found, upon the written request of the Contractor, that the applicable standards of the Davis-Bacon act have been met.  The Secretary of labor may require the Contractor to set aside in a separate account assets for the meeting of obligations under the plan or program.

(2)     **Withholding.**  The Authority shall upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld from the Contractor, under this agreement or any other federal contract with the same recipient or any other federally-assisted contract subject to Davis-Bacon prevailing wage requirement, which is held by the same prime Contractor, so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics, including apprentices, trainees, and helpers, employed by the Contractor or any subcontractor the full amount of wages required by the contract.  In the event of failure to pay any laborer or mechanic, including any apprentice, trainee, or helper, employed or working on the site of the work (or under the United States Housing Act of 1937 or under the Housing Act of 1949 in the construction or development of the project), all or part of the wages required by the contract, the FTA may, after written notice to the Contractor, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee or funds until such violations have ceased.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

(3)  **Payrolls and Basic Records.** (a)    Payrolls and basic records relating thereto shall be maintained by the Contractor during the course of the work and preserved for a period of three years thereafter for all laborers and mechanics working at the site of the work (or under the United States Housing Act of 1937, or under the Housing Act of 1949, in the construction or development of the project).  Such records shall contain the name, address, and social security number of each such worker, his or her correct classification, hourly rates of wages paid (including rates of contributions or costs anticipated for bona fide fringe benefits or cash equivalents thereof of the types described in Section 1(b)(2)(b) of the Davis-Bacon act), daily and weekly number of hours worked, deductions made and actual wages paid.  Whenever the Secretary of labor has found under 29 C.F.R. §5 5.5(a)(1)(iv) that the wages of any laborer or mechanic include the amount of any costs reasonably anticipated in providing benefits under a plan or program described in Section 1(b)(2)(b) of the Davis-Bacon Act, the Contractor shall maintain records which show that the commitment to provide such benefits is enforceable, that the plan or program is financially responsible, and that the plan or program has been communicated in writing to the laborers or mechanics affected, and records which show the costs anticipated or the actual costs incurred in providing such benefits. Contractors employing apprenticeship or trainees under approved programs shall maintain written evidence of the registration of apprenticeship programs and certification of trainee programs, the registration of the apprentices and trainees, and the ratios and wage rates prescribed in the applicable programs.

(b)    1.    The Contractor shall submit weekly for each week in which any contract work is performed a copy of all payrolls to the FTA if the FTA is a party to the contract; but if the FTA is not such a party, the Contractor will submit the payrolls to the applicant, sponsor, or owner, as the case may be, for transmission to the FTA.  The payrolls submitted shall set out accurately and completely all of the information required to be maintained under 29 C.F.R. §5.5(a)(3)(i).  This information may be submitted in any form desired.  Optional form WH-347 is available for this purpose and may be purchased from the Superintendent of Documents (Federal Stock no. 029-005-00014-1), U.S. Government Printing Office, Washington, D.C.  20402.  The Prime Contractor is responsible for the submission of copies of payrolls by all Subcontractors.

2.    Each payroll submitted shall be accompanied by a "Statement of Compliance" signed by the Contractor or Subcontractor or his or her agent who pays or supervises the payment of the persons employed under the contract and shall certify the following:

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

      a.     That the payroll for the payroll period contains the information required to be maintained under 29 C.F.R. §5.5.(a)(3)(i) And that such information is correct and complete;

      b.     That each laborer or mechanic (including each helper, apprentice, and trainee) employed on the contract during the payroll period has been paid the full weekly wages earned, without rebate, either directly or indirectly, and that no deductions have been made either directly or indirectly from the full wages earned, other than permissible deductions as set forth at 29 C.F.R. Part 3;

c.     That each laborer or mechanic has been paid not less than the applicable wage rates and fringe benefits or cash equivalents for the classification of work performed, as specified in the applicable wage determination incorporated into the contract.

3.     The weekly submission of a properly executed certification set forth on the reverse side of optional Form WH-347 shall satisfy the requirement for submission of the "Statement of Compliance" required by 29 C.F.R. §5.5(a)(3)(ii)(B).

4.     The falsification of any of the above certifications may subject the Contractor or Subcontractor to civil or criminal prosecution under 18 U.S.C. §1001 and 31 U.S.C. §231.

(c)     The Contractor or Subcontractor shall make the records required under 29 C.F.R. - §5.5(a)(3)(i) available for inspection, copying, or transcription by authorized representatives of the FTA or the Department of Labor, and shall permit such representatives to interview employees during working hours on the job. If the Contractor or Subcontractor fails to submit the required records or make them available, the FTA may, after written notice to the Contractor, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds. Furthermore, failure to submit the required records upon request or make such records available may be grounds for debarment action pursuant to 29 C.F.R. §5.12.

(4)     **Apprentices and Trainees.**  (a)     Apprentices.  Apprentices will be permitted to work at less than the predetermined rate for the work they performed when they are employed pursuant to and individually registered in a bona fide apprenticeship program registered with the U.S. Department of Labor, Employment and Training Administration, Bureau of Apprenticeship

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

and Training, or with a State apprenticeship agency recognized by the Bureau, or if a person is employed in his or her first 90 days of probationary employment as an apprentice in such an apprenticeship program, who is not individually registered in the program, but who has been certified by the Bureau of Apprenticeship and Training or a State Apprenticeship Agency (where appropriate) to be eligible for probationary employment as an apprentice. The allowable ratio of apprentices to journeymen on the job site in any craft classification shall not be greater than the ratio permitted to the Contractor as to the entire work force under the registered program. Any worker listed on a payroll at an apprentice wage rate, who is not registered or otherwise employed as stated above, shall be paid not less than the applicable wage on the wage, determination for the classification of work actually performed. In addition, any apprentice performing work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the work actually performed. Where a Contractor is performing construction on a project in a locality other than that in which its program is registered, the ratios and wage rates (expressed in percentages of the journeyman's hourly rate) specified in the Contractor's or Subcontractor's registered program shall be observed. Every apprentice must be paid at not less than the rate specified in the registered program for the apprentice's level of progress, expressed as a percentage of the journeyman hourly rate specified in the applicable wage determination. Apprentices shall be paid fringe benefits in accordance with the provisions of the apprenticeship program. If the apprenticeship program does not specify fringe benefits, apprentices must be paid the full amount of fringe benefits listed on the wage determination for the applicable classification. If the Administrator determines that a different practice prevails for the applicable apprentice classification, fringe benefits shall be paid in accordance with that determination. In the event the bureau of apprenticeship and training, or a state apprenticeship agency recognized by the Bureau, withdraws approval of an apprenticeship program, the Contractor will no longer be permitted to utilize apprentices at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

(b)    Trainees. Except as provided in 29 C.F.R. §5.16, trainees will not be permitted to work at less than the predetermined rate for the work performed unless they are employed pursuant to and individually registered in a program which has received prior approval, evidenced by formal certification by the U.S. Department of Labor, Employment and Training Administration. The ratio of trainees to journeymen on the job site shall not be greater than permitted under the plan approved by the Employment and Training Administration. Every trainees must be paid at not less than the rate specified

in the approved program for the trainee's level of progress, expressed as a percentage of the journeyman hourly rate specified in the applicable wage determination. Trainees shall be paid fringe benefits in accordance with the provisions of the trainee program. If the trainee program does not mention fringe benefits, trainees shall be paid the full amount of fringe benefits listed on the wage determination unless the Administrator of the Wage and Hour Division determines that there is an apprenticeship program associated with the corresponding journeyman wage rate on the wage determination that provides for less than full fringe benefits for apprentices. Any employee listed on the payroll at a trainee rate who is not registered and participating in a training plan approved by the employment and training administration shall be paid not less than the applicable wage rate on the wage determination for the classification of work actually performed. In addition, any trainee performing work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the work actually performed. In the event the employment and training administration withdraws approval of a training program, the Contractor will no longer be permitted to utilize trainees at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

(c)  Equal employment opportunity.  The utilization of apprentices, trainees, and journeymen under 29 C.F.R. Part 5 shall be in conformity with the equal employment opportunity requirements of Executive Order No. 11246, as amended 29 C.F.R. Part 30.

(d)  Helpers.  Helpers will be permitted to work on a project if the helper classification is specified on an applicable wage determination or is approved pursuant to the conformance procedure set forth in 29 C.F.R. §5.5(a)(1)(ii). The allowable ratio of helpers to journeyman employed by the Contractor or subcontractor on the job site shall not be greater than two helpers for every three journeymen (in other words, not more than 40 percent of the total number of journeymen and helpers in each Contractor's or in each Subcontractor's own work force employed on the job site.) Any worker listed on a payroll at a helper wage rate, who is not a helper as defined in 29 C.F.R. §5.2(n)(4), shall be paid not less than the applicable wage rate on the wage determination for the classification of work actually performed. In addition, any helper performing work on the job site in excess of the ratio permitted shall be paid not less than the applicable journeyman's (or laborer's, where appropriate) wage rate on the wage determination for the work actually performed.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

(5)    **Compliance with Copeland Act Requirements**. The Contractor shall comply with the requirements of 29 C.F.R. Part 3, which are incorporated herein by reference.

(6)    **Contract Termination:    Debarment**. A branch of the contract clauses in 29 C.F.R. §5.5 may be grounds for termination of the contract, and for debarment as a Contractor and a Subcontractor as provided in 29 C.F.R. §5.12.

(7)    **Compliance with Davis-Bacon and Related Act Requirements**. All rulings and interpretations of the Davis-Bacon and related Acts contained in 29 C.F.R. Parts 1, 3 and 5 are incorporated herein by reference.

(8)    **Disputes Concerning Labor Standards**. Disputes arising out of the Labor Standards Provisions of this contract shall not be subject to the general disputes clause of this contract. Such disputes shall be resolved in accordance with the procedures of the Department of Labor set forth in 29 C.F.R. Parts 5, 6, and 7. Disputes within the meaning of this clause include disputes between the Contractor (and any of its Subcontractor) and the contracting agency, the U.S. Department of Labor, or the employees or their representatives.

(9)    **Certification of Eligibility**. (a)     By entering into this agreement or a third party contract financed under this agreement the Contractor certifies that neither it (nor he nor she) nor any person or firm that has an interest in the Contractor's firm is a person or firm ineligible to be awarded government contracts by virtue of Section 3(a) of the Davis-Bacon Act or 29 C.F.R. §5.12(a)(1).

       (b)     No part of this contract shall be subcontracted to any person or firm ineligible for award of a Government contract by virtue of Section 3(a) of the Davis-Bacon Act or 29 C.F.R. §5.12(a)(1).

       (c)     The penalty for making false statement is prescribed in the U.S. Criminal code, 18 U.S.C. 1001.

(10)    **Overtime Requirements**. No Contractor or subcontractor contracting for any part of the contract work which may require or involve the employment of laborers or mechanics shall require or permit any such laborer or mechanics in any work week in which he or she is employed on such work to work in excess of forty hours in such work week unless such laborer or mechanics receives compensation at a rate not less than one and one-half times the basic rate of pay for all hours worked in excess of forty hours in such work week.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

(11)    **Violation:  Liability for Unpaid Wages:  Liquidated Damages.**  In the event of any violation of the requirements of 29 C.F.R. §5.5(b)(1), the Contractor and any Subcontractor responsible therefor shall be liable for the unpaid wages.  In addition, such Contractor and Subcontractor shall be liable to the united states (in the case of work done under contract for the District of Columbia or a territory, to such district or to such territory) for liquidated damages.  Such liquidated damages shall be computed with respect to each individual laborer or mechanic, including watchmen and guards, employed in violation of 29 C.F.R. §5.5(b)(1) In the sum of $10 for each calendar day on which such individual was required or permitted to work in excess of the standard work week of forty hours without payment of the overtime wages required by 29 C.F.R. §5.5(b)(1).

(12)    **Withholding for Unpaid Wages and Liquidated Damages.**  The Authority may withhold or cause to be withheld, from any moneys payable on account of work performed by the Contractor or subcontractor under any such Contractor, or any other Federal contract with the same prime Contractor or any other federally-assisted contract subject to the Contract Work Hours and Safety Standards Act, which is held by the same prime Contractor, such sums as may be determined to be necessary to satisfy any liabilities of such Contractor or subcontractor for unpaid wages and liquidated damages as provided in the clause set forth at 29 C.F.R. §5.5(b)(2).

(13)    **Subcontracts.**  The Contractor or Subcontractor shall insert in any subcontracts, the clauses set forth in subparagraphs (1) through (13) of this Labor Provisions Article, and also a clause requiring the Subcontractor to include these clauses in any lower tier subcontracts.  The Prime Contractor shall be responsible for compliance by any Subcontractor with the clauses set forth in subparagraphs (1) through (12) of this Labor Provisions Article.

## 2013    FEDERAL CHANGES

a.    Contractor shall at all times comply with all applicable FTA regulations, policies, procedures and directives, including without limitation those listed directly or by reference in the Agreement (Form FTA MA (8) dated October, 1, 2001) between the Authority and FTA, as they may be amended or promulgated from time to time during the term of this contract. Contractor's failure to so comply shall constitute a material breach of this contract.

b.    The Contractor agrees to include this clause in each subcontract financed in whole or in part with Federal assistance provided by FTA.  It is further agreed that the clause shall not be modified, except to identify the subcontractor who will be subject to its provisions.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

**20.14  NO OBLIGATION BY THE FEDERAL GOVERNMENT**

a.       The Authority and Contractor acknowledge and agree that, notwithstanding any concurrence by the Federal Government in or approval of the solicitation or award of this contract, absent the express written consent by the Federal Government, the Federal Government is not a party to this contract and shall not be subject to any obligations or liabilities to the Authority, Contractor, or any other party (whether or not a party to that contract) pertaining to any matter resulting from the underlying contract.

b.       The Contractor agrees to include this clause in each subcontract financed in whole or in part with Federal assistance provided by FTA. It is further agreed that the clause shall not be modified, except to identify the subcontractor who will be subject to its provisions.

**20.15  PROGRAM FRAUD AND FALSE OR FRAUDULENT STATEMENTS AND RELATED ACTS**

a.       The Contractor acknowledges that the provisions of the Program Fraud Civil Remedies Act of 1986, as amended, 31 U.S.C. § § 3801 et seq . and U.S. DOT regulations, "Program Fraud Civil Remedies," 49 C.F.R. Part 31, apply to its actions pertaining to this Project. Upon execution of the underlying contract, the Contractor certifies or affirms the truthfulness and accuracy of any statement it has made, it makes, it may make, or causes to be made, pertaining to the underlying contract or the FTA assisted project for which this contract work is being performed. In addition to other penalties that may be applicable, the Contractor further acknowledges that if it makes, or causes to be made, a false, fictitious, or fraudulent claim, statement, submission, or certification, the Federal Government reserves the right to impose the penalties of the Program Fraud Civil Remedies Act of 1986 on the Contractor to the extent the Federal Government deems appropriate.

b.       The Contractor also acknowledges that if it makes, or causes to be made, a false, fictitious, or fraudulent claim, statement, submission, or certification to the Federal Government under a contract connected with a project that is financed in whole or in part with Federal assistance originally awarded by FTA under the authority of 49 U.S.C. § 5307, the Government reserves the right to impose the penalties of 18 U.S.C. § 1001 and 49 U.S.C. § 5307(n)(1) on the Contractor, to the extent the Federal Government deems appropriate.

c.       The Contractor agrees to include this clause in each subcontract financed in whole or in part with Federal assistance provided by FTA. It is further agreed that the clauses shall not be modified, except to identify the subcontractor who will be subject to the provisions.

**20.16  INCORPORATION OF FEDERAL TRANSIT ADMINISTRATION (FTA) TERMS**

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

a.      The preceding provisions include, in part, certain Standard Terms and Conditions required by DOT, whether or not expressly set forth in the preceding contract provisions. All contractual provisions required by DOT, as set forth in FTA Circular 4220.1D, dated April 15, 1996, as amended by Change 1 thereto dated August 4, 1998, are hereby incorporated by reference. Anything to the contrary herein notwithstanding, all FTA mandated terms shall be deemed to control in the event of a conflict with other provisions contained in this Agreement. The Contractor shall not perform any act, fail to perform any act, or refuse to comply with any WMATA requests which would cause WMATA to be in violation of the FTA terms and conditions.

b.      The Contractor agrees to include this clause in each subcontract financed in whole or in part with Federal assistance provided by FTA. It is further agreed that the clause shall not be modified, except to identify the subcontractor who will be subject to the provisions.

### 20.17   SEAT BELT USE POLICY      (November 2000)

The contractor agrees to comply with terms of Executive Order No. 13043 "Increasing Seat Belt Use in the United States" and is encouraged to include those requirements in each subcontract awarded for work relating to this contract.

### 20.18   CONTRACT WORK HOURS AND SAFETY STANDARDS ACT

a.      Overtime requirements: No contractor or subcontractor contracting for any part of the contract work which may require or involve the employment of laborers, mechanics, apprentices, trainees, watchmen, and guards shall require or permit any laborer, mechanic, apprentice, trainee, watchman, or guard in any workweek in which he or she is employed on such work to work in any workweek in which he or she is employed on such work to work in excess of 40 hours in such work week on work subject to the provisions of the Contract Work Hours and Safety Standards Act unless such laborer, mechanic, apprentice, trainee, watchman, or guard receives compensation at a rate not less than one and one-half times his or her basic rate of pay for all such hours worked in excess of 40 hours in such work week.

b.      Violation: Liability for Unpaid Wages: Liquidated Damages. In the event of any violation of the provisions of Paragraph (a), the Contractor and any subcontractor responsible therefor shall be liable to any affected employee for his or her unpaid wages. In addition, such Contractor and subcontractor shall be liable to the Authority for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer, mechanic, apprentice, trainee, watchman, or guard employed in violation of the provisions of Paragraph (a) in the sum of $10 for each calendar day on which such employee was required or permitted to be employed on such work in excess of his or her standard work week of 40

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

hours without payment of the overtime wages required by Paragraph (a).

c.      Withholding for Unpaid Wages and Liquidated Damages: The Contracting Officer may withhold from the Contractor, from any monies payable on account of work performed by the Contractor or subcontractor, such sums as may be administratively determined to be necessary to satisfy any liabilities of such Contractor or subcontractor for unpaid wages and liquidated damages as provided in the provisions of Paragraph (b).

d.      Subcontracts: The Contractor shall insert Paragraphs (a) through (e) of this article in all subcontracts and shall require their inclusion in all subcontracts of any tier.

e.      Records: the Contractor shall maintain payroll records containing the information specified in 29 CFR 516.2(a). Such records shall be preserved for three years from the completion of the Contract.

## 20.19   **ACCESS TO RECORDS** *[use in contracts over $100,000]*

a.      The Contractor shall maintain records and the Contracting Officer or other delegated Authority's Representative, the FTA Administrator or his authorized representatives, including any PMO Contractor, the U.S. Department of Transportation, and the Comptroller General of the United States or any of their duly authorized representatives shall have access to and the right to examine any books, documents, papers and records of the Contractor, involving transactions related to this Contract.

b.      The Contractor agrees to permit any of the foregoing parties to reproduce by any means whatsoever or to copy excerpts and transcriptions as reasonably needed.

c.      The Contractor agrees to maintain all books, records, accounts and reports required under this contract for a period of not less than three years after the date of termination or expiration of this contract, except in the event of litigation or settlement of claims arising from the performance of this contract, in which case Contractor agrees to maintain same until the Authority, the FTA Administrator, the Comptroller General, or any of their duly authorized representatives, have disposed of all such litigation, appeals, claims or exceptions related thereto. Reference 49 CFR 18.39(i)(11).

d.      The Contractor agrees to include this clause in each subcontract awarded for work performed under this Contract.  It is further agreed that the clause shall not be modified, except to identify the subcontractor who will be subject to its provisions.

## 20.20   **FLY AMERICA REQUIREMENTS** -

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

The Contractor agrees to comply with 49 U.S.C. 40118 (the "Fly America" Act) in accordance with the General Services Administration's regulations at 41 CFR Part 301-10, which provide that recipients and subrecipients of Federal funds and their contractors are required to use U.S. Flag air carriers for U.S Government-financed international air travel and transportation of their personal effects or property, to the extent such service is available, unless travel by foreign air carrier is a matter of necessity, as defined by the Fly America Act. The Contractor shall submit, if a foreign air carrier was used, an appropriate certification or memorandum adequately explaining why service by a U.S. flag air carrier was not available or why it was necessary to use a foreign air carrier and shall, in any event, provide a certificate of compliance with the Fly America requirements. The Contractor agrees to include the requirements of this section in all subcontracts that may involve international air transportation.

## 20.21  CONTRACTS INVOLVING FEDERAL PRIVACY ACT REQUIREMENTS -

The following requirements apply to the Contractor and its employees that administer any system of records on behalf of the Federal Government under any contract:

(1) The Contractor agrees to comply with, and assures the compliance of its employees with, the information restrictions and other applicable requirements of the Privacy Act of 1974, 5 U.S.C. §§ 552a. Among other things, the Contractor agrees to obtain the express consent of the Federal Government before the Contractor or its employees operate a system of records on behalf of the Federal Government. The Contractor understands that the requirements of the Privacy Act, including the civil and criminal penalties for violation of that Act, apply to those individuals involved, and that failure to comply with the terms of the Privacy Act may result in termination of the underlying contract.

(2) The Contractor also agrees to include these requirements in each subcontract to administer any system of records on behalf of the Federal Government financed in whole or in part with Federal assistance provided by FTA.

## 20.22  SPECIAL PROVISIONS OF INSURANCE (revised 01/01/2001):

a.       The contractor shall forward to the Contracting Officer for approval a certificate or certificates, issued by the insured(s), of the insurance required under the foregoing provisions, including special endorsements.   Such certificate(s) shall be in a form satisfactory to WMATA and shall list the various coverages and limits.   Insurance companies providing the coverage must be acceptable to WMATA, rated by A.M. Best

and carry at least an "A" rating. In addition to any provisions herein before required; a provision of such insurance policies shall not be changed or cancelled and they will be automatically renewed upon expiration and continued in full force and effect until final acceptance by WMATA of all work covered by the contract, unless WMATA is given thirty (30) days written notice before any change or cancellation is made effective. The Contractor shall directly furnish the Contracting Officer with a certified copy of each insurance policy upon request.

b.       All insurance shall be procured from insurance or indemnity companies acceptable to WMATA and licensed and authorized to conduct business in the District of Columbia, State of Maryland and Commonwealth of Virginia. WMATA approval or failure to disapprove insurance furnished by the Contractor shall not release the Contractor of full responsibility for liability for damage and accidents.

c.       If at any time the above required insurance policies should be cancelled, terminated or modified so that the insurance is not in full-force and effect as required herein the Contracting Officer may terminate this contract for default or obtain insurance coverage equal to that required herein, the full cost of which shall be charged to the Contractor and deducted from any payments due the Contractor.

d.       The Contractor shall require each subcontractor, at all tiers to provide evidence of insurance coverage specified herein and such evidence of coverage shall be provided to the Contractor prior to commencement of work. Such coverage shall remain in full force and effect during the performance of work on this project.

e.       Any contract of insurance or indemnification naming WMATA, the United States of America, or any of the departments, agencies, administrators or authorities as an insured shall be endorsed to provide that the insurer will not contend in the event of any occurrence, accident, or claim that WMATA or the United States of America, et al, are not liable in tort by virtue of the fact of being governmental instrumental instrumentalities or public quasi-public bodies.

f.       In the event the required certificates of insurance as specified herein are not furnished within ten calendar days after the date of award of the contract, the Contracting Officer may issue the Notice to Proceed and contract time will start upon Contractor's receipt of Notice to Proceed. If the contract includes site work, the Contractor shall not be permitted to work at the site until all required insurance certificates have been received.

g.       Notice of Cancellation, nonrenewable or material change in coverage shall be provided to WMATA at least thirty (30) days prior to action. The words " endeavor to" and "but failure to" (to the end of sentence) are to be eliminated from the notice of Cancellation provision on standard ACORD certificates.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

## 20.23  POLLUTION ABATEMENT

a.    The Contractor shall by every means possible conduct his operations in a manner to minimize pollution of the environment surrounding the area of work.  Specific controls shall be applied as follows:

(1)    Material transport:  Trucks leaving the site and entering paved public streets shall be cleaned of mud and dirt clinging to the body and wheels of the vehicles. Trucks arriving and leaving the site with materials shall be loaded so as to prevent dropping materials and debris on the streets.  The Contractor shall maintain a suitable vehicle cleaning installation and inspection installation with permanent crew for this purpose.  Spills of materials in public areas shall be removed immediately.

(2)    Waste materials:  No waste or erosion materials shall be allowed to enter natural or man-made water or sewage removal systems.  Erosion materials from excavations, borrow areas or stockpiled fill shall be contained within the work area.  The Contractor shall develop methods to control waste and erosion including such means as filtration, settlement and manual removal.

(a)    The Contractor shall comply with the following:

[1]    Maryland:

[a]    Chapter 245 of the Acts of the 1970 General Assembly of the State of Maryland which provides for a statewide erosion and sediment control program in Maryland under the guidance of the Department of Natural Resources.

[b]    Prior to the start of the applicable earthwork construction the Contractor shall submit schedules for accomplishment of erosion control work in the State of Maryland as are applicable for earthwork under this Contract.  No earthwork operations in the State of Maryland shall be started until the Contractors erosion control schedules and methods of operation have been approved.

(3)    Burning:  No burning of waste shall be allowed without written permission. When permission is granted, burning shall be conducted in accordance with the regulations of the jurisdictional agency.

(4)    Dust control:  The Contractor shall by water sprinkling or other approved methods continuously control dust generated by his operations.

(5)    The Contractor, subcontractors and suppliers must submit evidence to the

Authority that the governing air pollution criteria will be met. This evidence and related documents will be retained by the Authority for on-site examination by FTA.

b.      The Contractor shall submit a program for pollution control prior to beginning operations.

c.      Demolition shall be performed in compliance with the requirements of the United States Environmental Protection Agency, National Emission Standards for Hazardous Air Pollutants, Section 112 of the Clean Air Act as amended 42 U.S.C. 1857 et seq. (the Act). This act covers air pollution from asbestos, beryllium, and mercury and requires prior notification to the Agency of intent to demolish a building having these materials and certain precautionary measures during demolition.

d.      Clean air and water:

(1)     The Contractor agrees as follows:

(a)     To comply with all the requirements of Section 114 of the Clean Air Act, as amended (42 U.S.C. 1857, et seq., as amended by Pub. L. 91-604) and Section 308 of the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq., as amended by Pub. L. 92-500), respectively, relating to inspection, monitoring, entry, reports and information, as well as other requirements specified in Section 114 and Section 308 of the Air Act and the Water Act, respectively, and all regulations and guidelines issued thereunder before the award of this Contract.

(b)     That no portion of the work required by this prime Contract will be performed in a facility listed on the EPA List of Violating Facilities on the date when this Contract was awarded unless and until the EPA eliminates the name of such facility or facilities from such listing.

(c)     To comply with clean air standards, clean water standards, and the Resource Conservation and Recovery Act (RCRA), at the facility in which the Contract is being performed.

(d)     To insert the substance of the provisions of this clause into any nonexempt subcontract, including this paragraph.

(e)     To obtain any necessary waste water discharge permits prior to discharging waste water generated at the work site.

(2)     The terms used in this article have the following meanings:

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

(a)     The term Air Act means the Clean Air Act, as amended (42 U.S.C. 1857 et seq., as amended by Pub. L. 91-604).

(b)     The term Water Act means Federal Water Pollution Control Act, as amended (33 U.S.C. 1251 et seq., as amended by Pub. L. 92-500).

(c)     The term clean air standards means any enforceable rules, regulations, guidelines, standards, limitations, orders, controls, prohibitions or other requirements which are contained in, issued under or otherwise adopted pursuant to the Air Act or Executive Order 11738, an applicable implementation plan as described in Section 110(d) of the Clean Air Act (42 U.S.C. 1857c-5(d)), an approved implementation procedure or plan under Section 111(c) or Section 111(d), respectively, of the Air Act (42 U.S.C. 1857c-6(c) or (d)), or an approved implementation procedure under Section 112(d) of the Air Act (42 U.S.C. 1857c-7(d)).

(d)     The term clean water standards means any enforceable limitation, control, condition, prohibition, standard or other requirement which is promulgated pursuant to the Water Act or contained in a permit issued to a discharger by the EPA or by a State under an approved program, as authorized by Section 402 of the Water Act (33 U.S.C. 1342), or by local government to ensure compliance with pretreatment regulations as required by Section 307 of the Water Act (33 U.S.C. 1317).

(e)     The term  compliance means compliance with clean air or water standards and with the Resource Conservation and Recovery Act (RCRA).  Compliance shall also mean compliance with a schedule or plan ordered or approved by a court of competent jurisdiction, the EPA or an air or water pollution control agency in accordance with the requirements of the Air Act, Water Act, RCRA, and regulations issued pursuant thereto.

(f)     The term facility means any building, plant, installation, structure, mine, vessel or other floating craft, location or site of operations, owned, leased or supervised by a contractor or subcontractor, to be utilized in the performance of a contract or subcontract.  Where a location or site of operations contains or includes more than one building, plant installation or structure, the entire location or site shall be deemed to be a facility except where the Director, Office of Federal Activities, Environmental Protection Agency, determines that independent facilities are co-located in one geographical area.

(g)     The term RCRA means the Resource Conservation and Recovery Act of 1976.

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

IN WITNESS WHEREOF, the parties have caused this Installation Subcontract to be executed by their duly authorized representatives as of the day and year first set forth above.

UNION SWITCH & SIGNAL INC.          SACHS ELECTRIC.

By: _John H Borman_                  By: _W.C. M(Cg_

Name: _JOHN G BORMAN_                 Name: _W.C. WOOLDRIDGE_

Title: _V/P & CFO_                    Title: _GENERAL MANAGER_

DRAFT COPY – JULY 17, 2003
DRAFT REVISION DATE 9/30/03
DRAFT REVISION DATE 4/7/04
FINAL REVISION 5/18/04

**EXHIBIT I**

**The Work**

The Subcontractor is responsible for the following work scope for New Carrollton, Landover, and Cheverly locations:

1. Field survey support.

2. Installation of cardfiles / ATP Track Modules in the train control rooms. Modules to be furnished by US&S.

3. Installation of additional cabling within the train control rooms as required. Cabling to be furnished by US&S.

4. Replacement and installation of all wayside impedance bonds, including all bond mounting equipment, and all two foot and four foot induction loops. Bonds and loops to be furnished by US&S.

5. Replacement and installation of local cable from Item 4 devices to the nearest wayside terminal box. Cables to be furnished by US&S.

6. Replacement and installation of wayside bridging receivers. Receiver to be furnished by US&S.

7. Replacement and installation of existing circuits from bridging receivers to track connection. Wiring to be furnished by subcontractor.

8. Replacement and installation of new wayside track junction boxes and loop junction boxes as detailed in the contract specification. Boxes to be furnished by subcontractor.

9. Replacement and installation of speed command single turn hose loops. Hose, wire and supports to be furnished by subcontractor.

10. Testing and cutover support.

11. Subcontractor will furnish necessary fastening material, 1000 KCMIL cable, lugs and rail clamps terminating material, and replacement raceway.

12. Subcontractor will coordinate and deliver to WMATA all removed material scheduled for return.

13. Subcontractor will receive, store and deliver to the site the US&S furnished equipment.

14. Subcontractor will provide a workspace in the job site trailer for US&S personnel and for drawing and file storage, storage of test equipment, use of copier machine and other items as may be necessary.

15. Subcontractor will coordinate and submit the required track rights and access requests to WMATA.

16. Subcontractor will prepare and update a field installation schedule and participate in the incorporation into US&S' master schedule monthly.

17. Subcontractor will provide applicable insurance coverage and performance bond in accordance with the Contract Specifications excluding the Errors and Omission Liability Insurance.

MFO

**EXHIBIT II**

Progress Payment Schedule

| | | | |
|---|---|---|---|
| Cheverly Track Circuits | | 40 ea @ $8400 = | $336,000 |
| Landover Track Circuits | | 44 ea @ $7455 = | $328,020 |
| New Carrollton Track Circuits | 25 | 26 ea @ $11,360 = | $284,000 |
| Mobilization | | 1 LS @ $24,980 | $24,980 |
| | | **Total** | **$973,000** |